## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

IN THE MATTER OF THE SEARCH OF:

BLUE HTC CELL PHONES
MODEL PM23220 BEARING

SERIAL NUMBER HT2CVW605370

SERIAL NUMBER HT2B8W602118

Mag. No.

## AFFIDAVIT IN SUPPORT OF AN APPLICATION
## UNDER RULE 41 FOR A WARRANT TO SEARCH

I, Floriano Whitwell (hereinafter "Your Affiant") being duly sworn, do hereby depose

and state the following:

## INTRODUCTION AND AGENT BACKGROUND

1.     Your Affiant is a Senior Inspector (SI) with the United States Marshals Service

(USMS) and, as such, is charged with enforcing all laws in all jurisdictions of the United States,

its territories and possessions.  Your Affiant is currently the Sex Offender Investigative

Coordinator (SOIC) for the United States Marshals Service, D.C. Superior Court office.  Your

Affiant's tenure with the United States Marshals Service (USMS) spans over thirteen years, and

Your Affiant has been conducting criminal investigations in that capacity for eleven years.  Your

Affiant has been a Sex Offender Investigator for five years and is responsible for investigating

crimes involving individuals who are convicted sex offenders and who have failed to register as

required by Title 18 United States Code Section 2250, also known as the Adam Walsh Child

Protection and Safety Act of 2006, as well as the District of Columbia Sex Offender Registration

Act of 1999.  I am an "investigative or law enforcement officer" within the meaning of Title 18

United States Code Section 2510(7), that is, an officer of the United States, who is empowered

by law to conduct investigations of or to make arrests for offenses listed in Title 18 United States

1

Code Section 2516.  During Your Affiant's tenure with the USMS, Your Affiant has conducted and participated in numerous investigations of criminal activity.  During the investigations of such cases, Your Affiant has participated in the execution of searches pursuant to search warrants and consent searches and seized evidence of criminal violations.

2.      This affidavit is made in support of an application for a search and seizure warrant to search for and seize instrumentalities, fruits, and evidence of violations of Title 18 United States Code Section 2251, which criminalizes the production of child pornography, and Title 18 United States Code Section 2252, which criminalizes the possession of child pornography.

3.      The statements contained herein are based on the investigation of the Your Affiant and other law enforcement personnel, and also on the experience and training of the Your Affiant, and other law enforcement personnel.  Since this affidavit is being submitted for the limited purpose of securing a search warrant, Your Affiant has not included each and every fact known to Your Affiant concerning this investigation.  Your Affiant has set forth only the facts that Your Affiant believes are necessary to establish probable cause to believe that evidence of the violations previously mentioned are located within the contents on the two blue HTC cell phones bearing serial numbers HT2CVW605370 and HT2B8W602118.

## IDENTIFICATION OF THE TARGET DEVICES TO BE EXAMINED

4.    This affidavit is respectfully submitted in support of a search warrant for the following evidence: two blue HTC cell phones, model number PM23220, bearing serial numbers HT2CVW605370 and HT2B8W602118.

## RELEVANT STATUTES

5.    This investigation concerns alleged violations of Title 18, United States Code, Sections 2251 and 2252 relating to material involving the sexual exploitation of minors.  Pursuant to Title 18 United States Code Section 2251(a), it is a violation of federal law for a person to "employ,

use, persuade, induce, entice, or coerce any minor to engage in, or who has a minor assist any other person to engage in, or who transports any minor in or affecting interstate or foreign commerce, or in any Territory or Possession of the United States, with the intent that such minor engage in, any sexually explicit conduct for the purpose of producing any visual depiction of such conduct, shall be punished as provided under subsection (e), if such person knows or has reason to know that such visual depiction will be transported or transmitted using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce or mailed, if that visual depiction was produced or transmitted using materials that have been mailed, shipped, or transported in or affecting interstate or foreign commerce by any means, including by computer, or if such visual depiction has actually been transported or transmitted using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce or mailed." Pursuant to Title 18 United States Code Sections 2252(a)(4) and 2252A(a)(5), it is a violation to possess one or more materials which contains a visual depiction of minor(s) engaged in sexually explicit conduct that have been transported in interstate or foreign commerce or that were produced using materials that had traveled in interstate or foreign commerce.

## **RELEVANT DEFINITIONS**

6.   The following definitions apply to this Affidavit:

a.      The Internet is a global network of computers and other electronic devices that communicate with each other using numerous specified protocols. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

b.      "Encryption" is the process of encoding messages or information in such a way that eavesdroppers or hackers cannot read it but authorized parties can.  In an encryption scheme, the message or information, referred to as plaintext, is encrypted using an encryption algorithm, turning it into an unreadable ciphertext.  This is usually done with the use of an encryption key, which specifies how the message is to be encoded.  Any adversary that can see the ciphertext should not be able to determine anything about the original message.  An authorized party, however, is able to decode the ciphertext using a decryption algorithm that usually requires a secret decryption key, to which adversaries do not have access.

c.      "Cache" means the text, image, and graphic files sent to and temporarily stored by a user's computer from a website accessed by the user in order to allow the user speedier access to and interaction with that website.

d.      "Child Erotica" means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not, in and of themselves, obscene or that do not necessarily depict minors in sexually explicit poses or positions.

e.      "Child Pornography" means the definition in 18 U.S.C. § 2256(8) (any visual depiction of sexually explicit conduct where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct, (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct, or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct), as well as any visual depiction, the production of which involves the use of a minor engaged in sexually explicit conduct. *See* 18 U.S.C. §§ 2252 and 2256(2)(8).

f.     "Computer" means "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device." See 18 U.S.C. § 1030(e)(1).

g.     "Internet Connection" means a connection required for access to the Internet.  The connection would be provided by cable, DSL (Digital Subscriber Line) or satellite systems.

h.     "Internet Service Providers" or "ISPs" mean commercial organizations which provide individuals and businesses access to the Internet.  ISPs provide a range of functions for their customers, including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment. ISPs can offer various means by which to access the Internet including telephone based dial-up, broadband based access via a digital subscriber line (DSL) or cable television, dedicated circuits, or satellite based subscription.  ISPs typically charge a fee based upon the type of connection and volume of data, called bandwidth that the connection supports. Many ISPs assign each subscriber an account name such as a user name or screen name, an e-mail address, and an e-mail mailbox, and the subscriber typically creates a password for the account.  By using a computer equipped with a telephone or cable modem, the subscriber can establish communication with an ISP over a telephone line or through a cable system, and can access the Internet by using his or her account name and password.

i.     "Minor" means any person under the age of eighteen years.  See 18 U.S.C. § 2256(1).

j.     "Sexually explicit conduct" means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, or oral-anal, whether between persons

of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic

abuse; or (e) lascivious exhibition of the genitals or pubic area of any persons.  See 18

U.S.C. § 2256(2).

k.     "Visual depictions" include undeveloped film and videotape, and data

stored on computer disk or by electronic means, which is capable of conversion into a

visual image.  See 18 U.S.C. § 2256(5).

### FACTS ESTABLISHING PROBABLE CAUSE

7.   On August 26, 2009, Andre Hammond (HAMMOND) was convicted of Misdemeanor

Sexual Abuse in District of Columbia Superior Court Case 2009 DVM 135.  He was sentenced

to 180 days of incarceration, followed by one year of supervised probation.  He was also ordered

to register as a sex offender for a period of ten years.  On January 23, 2010, HAMMOND

initially registered as a sex offender with the District of Columbia Sex Offender Registry and

provided a home address on Delaware Avenue, Southwest, in Washington, D.C.  HAMMOND

was classified as a "Class B" Registrant who must register as a sex offender annually for ten

years.  HAMMOND signed the Sex Offender Registration Information Form verifying the

submitted registration information and acknowledging his duties and responsibilities as a

registered sex offender.  The duties include a duty to report any changes of home, work or school

addresses, change in motor vehicle information, and any significant changes in physical

appearances.

8.   Accordingly, on January 25, 2011, January 17, 2012, and January 7, 2013, HAMMOND

registered with the District of Columbia Sex Offender Registry and on each occasion, completed

a Sex Offender Verification Form.  Each time, HAMMOND continued to provide a home

address on Delaware Avenue, Southwest, Washington, DC.

9.   In December of 2012, the USMS, Sex Offender Investigations Squad (SOIS), assigned to

the D.C. Superior Court Office, began an investigation to determine whether HAMMOND was in compliance with his registration requirements.  This investigation revealed that the home address HAMMOND was using on Delaware Avenue was the Greenleaf Senior Residence, a senior assisted living community.  Witnesses confirmed that while HAMMOND occasionally visited the apartment unit, he was never a resident at this location.

10. Rather, investigators learned that from November of 2009 through October of 2010, HAMMOND resided in Oxon Hill, Maryland.  However, at no time did HAMMOND update the District of Columbia Sex Offender Registry nor the Prince George's County Police Department, Sex Offender Registration Unit to reflect his residence in Oxon Hill, Maryland.

11. In October 2010, HAMMOND began to live with his girlfriend in Northeast, Washington D.C.  However, at no time did HAMMOND update the District of Columbia Sex Offender Registry to reflect this new address.

12. On October 15, 2013, HAMMOND was arrested and charged with Second Degree Child Sexual Abuse with Aggravating Circumstances in D.C. Superior Court Case Number 2013 CF3 18334.  The facts allege that HAMMOND sexually abused his girlfriend's daughter over the course of many years.  Specifically, the victim, C-1, disclosed that from approximately December of 2009 through approximately September of 2013, when C-1 was between the ages of eleven and fourteen years old, HAMMOND used his hand to touch the genitalia, breasts, and buttocks of C-1.  C-1 also disclosed that HAMMOND had taken nude photographs of her using a blue cellular phone and a black cellular phone on numerous occasions.  The defendant had threatened C-1 that HAMMOND would post these photographs to the Internet if C-1 told anyone about the abuse.

13. When HAMMOND was arrested on the warrant on October 15, 2013, he was

apprehended outside of a hotel room in Fredericksburg, Virginia.  During a search incident to arrest, USMS investigators seized a blue HTC cell phone bearing serial number HT2CVW605370 from HAMMOND'S hand.

14. Following HAMMOND'S arrest on October 15, 2013, Your Affiant and other USMS investigators assisted Stafford County Police Department detectives in executing a search warrant issued by the Circuit Court of Stafford for the Commonwealth of Virginia of the hotel room where HAMMOND was a guest, as well as a Volkswagen Touareg bearing Maryland temporary registration T896795 located on the curtilage of the hotel and registered to HAMMOND.  One of the items seized by Stafford County Police Department detectives from inside of the Volkswagen Touareg was an additional blue HTC cell phone bearing serial number HT2B8W602118.  Stafford County Detectives transferred custody of all seized items, including the HTC cell phone bearing serial number HT2B8W602118 to Your Affiant.

15. Investigators attempted to gain access to the contents on the HTC cell phone bearing serial number HT2B8W602118. However, these attempts were unsuccessful due to the existing technology being unable to bypass or unlock the cellular phone's password protection. Investigators did not attempt to gain access to the HTC cell phone bearing serial number HT2CVW605370.

16. On February 18, 2014, Your Affiant obtained and executed an arrest warrant for HAMMOND for Failure to Register as a Sex Offender, in violation of Title 18 United States Code Section 2250 pursuant to United States District Court Warrant 1:14-mj-173.  The pending Second Degree Child Sexual Abuse with Aggravating Circumstances case against HAMMOND in Superior Court for the District of Columbia, Criminal Case 2013 CF3 18334, was transferred to United States District Court for the District of Columbia as part of Case 1:14-mj-173.

17. On September 30, 2014, HAMMOND pled guilty before the Honorable Judge Ketanji

Jackson in Criminal Case 14-cr-184 to one count of Failure to Register as a Sex Offender, in

violation of Title 18 United States Code Section 2250(a), one count of Commission of a Crime

of Violence While Failing to Register as a Sex Offender, in violation of Title 18 United States

Code Section 2250(c), and one count of Second Degree Child Sexual Abuse, in violation of Title

22 D.C. Code Section 3009.  The case is currently set for a status hearing on April 18, 2016 for

the defendant to decide whether or not he intends to withdraw his guilty plea.

18. Your Affiant recently consulted with a forensic cell phone examiner who is also a federal

law enforcement agent and learned that newer advances in cell phone extraction technology have

made it possible to access the contents of the aforementioned cell phones that were previously

unavailable with password locked and encrypted cell phones.  The examiner believes it is now

possible to extract the contents of the subject devices by directly accessing the device memory,

and accordingly, locate the child pornographic images of C-1 that would corroborate her report

of sexual abuse, as well as be substantial evidence of separate crimes involving both the

Production and Possession of Child Pornography.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

19. Based on my training and experience, as well as my discussions with others involved

in child pornography investigations, it is my understanding that computer, smart phone, and

other digital device files, or remnants of such files, can be recovered months or even years after

they have been downloaded onto an electronic storage medium, deleted, or viewed via the

Internet.  Electronic files downloaded to an electronic storage medium can be stored for years at

little or no cost.  Even when such files have been deleted, they can be recovered months or years

later using readily-available forensics tools.  When a person "deletes" a file on a digital device

such as a home computer or a smart phone, the data contained in the file does not actually

disappear; rather, that data remains on the electronic storage medium until it is overwritten by

new data.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the electronic storage medium that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space – for long periods of time before they are overwritten.  In addition, a digital device's operating system may also keep a record of deleted data in a "swap" or "recovery" file.  Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache."  The browser typically maintains a fixed amount of electronic storage medium space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages.  Thus, the ability to retrieve "residue" of an electronic file from an electronic storage medium depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer, smart phone, or other digital device habits.

20.  Records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials contained on the digital devices are, as described further in Attachment B, called for by this warrant.  Those records will not always be found in digital data that is neatly segregable from the hard drive, flash drive, memory card, or other electronic storage media image as a whole.  Digital data on the electronic storage media not currently associated with any file can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  Virtual memory paging systems can leave digital data on a hard drive that show what tasks and processes on a computer were recently used.  Web browsers, e-mail programs, and chat programs often store configuration data on a hard drive, flash drive, memory card, or memory chip that can reveal information such as online nicknames and passwords.  Operating systems can record additional data, such as the attachment of

peripherals, the attachment of USB flash storage devices, and the times a computer, smart phone, or other digital device was in use.  Computer, smart phone, and other digital device file systems can record data about the dates files were created and the sequence in which they were created.  This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations.  Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

21. Forensic evidence on a cellular phone can also indicate who has used or controlled the cellular phone.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, registry information, configuration files, user profiles, e-mail, e-mail address books, "chat," instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the cellular phone at a relevant time.

22. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on storage media, like cellular phones, that are necessary to draw an accurate conclusion, is a dynamic process.  While it is possible to specify in advance the records to be sought, electronic storage media and digital device evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on electronic storage media or digital devices is evidence may depend on other information stored on the devices and the application of knowledge about how the devices behave.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

23. ***Methods To Be Used To Search Digital Devices***.  Based on my knowledge, training,

and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I know that:

a.        Searching digital devices can be an extremely technical process, often requiring specific expertise, specialized equipment, and substantial amounts of time. There are so many types of digital devices and software programs in use today that it is impossible to bring to the search site all of the necessary technical manuals, specialized equipment, and software programs necessary to conduct a thorough search.  Digital devices – whether, for example, desktop computers, mobile devices, or portable storage devices – may be customized with a vast array of software applications, each generating a particular form of information or records and each often requiring unique forensic tools, techniques, and expertise.  As a result, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched, and to obtain specialized hardware and software solutions to meet the needs of a particular forensic analysis.

b.        Digital data is particularly vulnerable to inadvertent or intentional modification or destruction.  Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data.  Recovery of "residue" of electronic files from electronic storage media also requires specialized tools and often substantial time.  As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

c.        The volume of data stored on many digital devices will typically be so large that it will be extremely impractical to search for data during the physical search of

the premises.  Smart phones capable of storing 64 gigabytes, flash drives capable of

storing 128 gigabytes, and desktop computers capable of storing 500 or more gigabytes

are now commonplace.  Consequently, just one device might contain enormous amounts

of data.

        d.       Further, as discussed above, evidence of how a digital device has been

used, the purposes for which it has been used, and who has used it, may be reflected in

the absence of particular data on a digital device.  For example, to rebut a claim that the

owner of a digital device was not responsible for a particular use because the device was

being controlled remotely by malicious software, it may be necessary to show that

malicious software that allows someone else to control the digital device remotely is not

present on the digital device.  Evidence of the absence of particular data or software on a

digital device is not segregable from the digital device itself.  Analysis of the digital

device as a whole to demonstrate the absence of particular data or software requires

specialized tools and a controlled laboratory environment, and can require substantial

time.

        e.       Digital device users can attempt to conceal data within digital devices

through a number of methods, including the use of innocuous or misleading filenames

and extensions.  For example, files with the extension ".jpg" often are image files;

however, a user can easily change the extension to ".txt" to conceal the image and make

it appear that the file contains text.  Digital device users can also attempt to conceal data

by using encryption, which means that a password or device, such as a "dongle" or

"keycard," is necessary to decrypt the data into readable form.  Digital device users may

encode communications or files, including substituting innocuous terms for incriminating

terms or deliberately misspelling words, thereby thwarting "keyword" search techniques

and necessitating continuous modification of keyword terms.  Moreover, certain file

formats, like portable document format ("PDF"), do not lend themselves to keyword

searches.  Some applications for computers, smart phones, and other digital devices, do

not store data as searchable text; rather, the data is saved in a proprietary non-text format.

Digital device users can conceal data within another seemingly unrelated and innocuous

file in a process called "steganography."  For example, by using steganography a digital

device user can conceal text in an image file that cannot be viewed when the image file is

opened.  Digital devices may also contain "booby traps" that destroy or alter data if

certain procedures are not scrupulously followed.  A substantial amount of time is

necessary to extract and sort through data that is concealed, encrypted, or subject to

booby traps, to determine whether it is evidence, contraband or instrumentalities of a

crime.

        f.      Analyzing the contents of mobile devices can be very labor intensive and

also requires special technical skills, equipment, and software.  The large, and ever

increasing, number and variety of available mobile device applications generate unique

forms of data, in different formats, and user information, all of which present formidable

and sometimes novel forensic challenges to investigators that cannot be anticipated

before examination of the device.  Additionally, most smart phones and other mobile

devices require passwords for access.  For example, even older iPhone 4 models, running

IOS 7, deployed a type of sophisticated encryption known as "AES-256 encryption" to

secure and encrypt the operating system and application data, which could only be

bypassed with a numeric passcode.  Newer cell phones employ equally sophisticated

encryption along with alpha-numeric passcodes, rendering most smart phones

inaccessible without highly sophisticated forensic tools and techniques, or assistance

from the phone manufacturer.  Mobile devices used by individuals engaged in criminal

activity are often further protected and encrypted by one or more third party applications,

of which there are many.  For example, one such mobile application, "Hide It Pro,"

disguises itself as an audio application, allows users to hide pictures and documents, and

offers the same sophisticated AES-256 encryption for all data stored within the database

in the mobile device.

   g.  Based on all of the foregoing, I respectfully submit that searching the

cellular phones pursuant to this warrant may require a wide array of electronic data

analysis techniques and may take weeks or months to complete.  Any pre-defined search

protocol would only inevitably result in over- or under-inclusive searches, and

misdirected time and effort, as forensic examiners encounter technological and user-

created challenges, content, and software applications that cannot be anticipated in

advance of the forensic examination of the media or devices.  In light of these difficulties,

your affiant requests permission to use whatever data analysis techniques reasonably

appear to be necessary to locate and retrieve digital information, records, or evidence

within the scope of this warrant.

   h.  In searching for information, records, or evidence, further described in

Attachment B, law enforcement personnel executing this search warrant will employ the

following procedures:

   1.  The analysis of the contents of the cellular phones may entail any

or all of various forensic techniques as circumstances warrant.  Such techniques

may include, but shall not be limited to, surveying various file "directories" and

the individual files they contain (analogous to looking at the outside of a file

cabinet for the markings it contains and opening a drawer believed to contain

pertinent files); conducting a file-by-file review by "opening," reviewing, or

reading the images or first few "pages" of such files in order to determine their

precise contents; "scanning" storage areas to discover and possibly recover

recently deleted data; scanning storage areas for deliberately hidden files; and

performing electronic "keyword" searches through all electronic storage areas to

determine whether occurrences of language contained in such storage areas exist

that are related to the subject matter of the investigation.

2.     In searching the seized cellular phones, the forensic examiners may

examine as much of the contents of the electronic storage media or digital devices

as deemed necessary to make a determination as to whether the contents fall

within the items to be seized as set forth in Attachment B.  In addition, the

forensic examiners may search for and attempt to recover "deleted," "hidden," or

encrypted data to determine whether the contents fall within the items to be seized

as described in Attachment B.  Any search techniques or protocols used in

searching the contents of the seized electronic storage media or digital devices

will be specifically chosen to identify only the specific items to be seized under

this warrant.

## <u>CONCLUSION</u>

24. Based upon these facts, there is probable cause to believe that there are fruits and

evidence of offenses involving violations of Title 18 United States Code Sections 2251 and 2252

that will be found within the seized item, as further described in Attachments A and Attachments

B.

25. I declare under penalty of perjury that the statements above are true and correct to

the best of my knowledge and belief.

_____
Floriano Whitwell
Senior Inspector U.S. Marshals Service

Sworn and subscribed before me
this 8th day of April, 2016.

_____
The Honorable Judge Deborah A. Robinson
United States Magistrate Judge